*04-12306*

# United States Court of Appeals
## For the First Circuit

———————————

No. 06-2036

SPECIALTY NATIONAL INSURANCE COMPANY,

Plaintiff, Appellant,

v.

ONEBEACON INSURANCE COMPANY,

Defendant, Appellee.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

———————————

Before

Boudin, Chief Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

———————————

John Egan, with whom Susan S. Riedel and Posternak Blankstein
& Lund LLP were on brief, for appellant.
    Peter G. Hermes, with whom Michael S. Batson and Hermes,
Netburn, O'Connor & Spearing, P.C. were on brief, for appellee.

———————————

May 23, 2007

———————————

**HOWARD, Circuit Judge.**   Specialty National Insurance Company appeals the district court's decision, reached on cross-motions for summary judgment, that Specialty, rather than appellee OneBeacon Insurance Company, has the duty to indemnify a policyholder for liability arising out of a catastrophic accident. We reverse and remand for entry of judgment in favor of Specialty.

## I.

The accident caused serious and permanent injuries to Marcia Rhodes, whose car was rear-ended by a tractor trailer on Route 109 in Medway, Massachusetts. Rhodes had brought her vehicle to a stop at the command of a Medway police officer directing traffic through an area where Jerry McMillan Professional Tree Service, Inc., was working to remove stumps along the northerly side of the road.[1]  McMillan was using a stump grinder attached to a pickup truck in the fashion of a trailer, driving the truck past each stump before backing the grinder up to it to begin the process.  McMillan had been grinding a stump for about three or four minutes at the time the accident occurred.

According to the police report, "[t]he vehicle being used . . . , a tree stump grinder on a trailer pulled by a pick-up truck, was straddling the Eastbound fog line, leaving a portion of

---

[1] Jerry McMillan Tree Service, Inc. is named for Jerry McMillan, who was performing the work in question.  Because the distinction between the corporation and the individual is irrelevant for our purposes, we use "McMillan" to refer to both.

-2-

the truck on the roadway.  As a result of this, [the officer] was
directing traffic through the work area, which had squeezed the
traffic area of the road down to one lane."  Because of this, the
officer stopped Rhodes in the eastbound lane to allow westbound
traffic to proceed.  But the driver of the tractor trailer, Carlo
Zalewski, was distracted as he approached in the eastbound lane and
did not see the officer's signal or Rhodes's car in enough time to
stop his vehicle.  The collision ensued.

        In due course, counsel for Rhodes wrote to the tractor
trailer's lessee, Building Materials Corporation of America, to
notify it of a claim against it for her injuries.  Counsel for BMCA
forwarded this letter to McMillan, asserting that its operations
may have contributed to the accident.  McMillan, in turn, contacted
its insurance agent, which notified Network Adjusters, the claims
administrator for Specialty.  McMillan had a general commercial
liability policy with Specialty, providing indemnification for
"those sums that the insured becomes legally obligated to pay as
damages because of personal injury or property damage . . ." and
imposing the "duty to defend the insured against any suit seeking
those damages."  Excluded from this coverage, however, were any
such damages "arising out of the ownership, maintenance, [or] use
. . . of any . . . auto . . . owned or operated by or rented or
loaned to any insured.  Use includes operation . . . ."

Network Adjusters acknowledged receipt of McMillan's claim on March 13, 2002. Though Network Adjusters engaged in some preliminary investigation, it did so under the impression that McMillan probably did not have any liability for the accident. In the meantime, Rhodes and her husband filed suit in Massachusetts state court against BMCA, Zalewski, and Driver Logistics, Inc., the agency that employed Zalewski to drive the truck, seeking damages suffered as a result of the accident.[2] Network Adjusters learned of this development on September 17, 2002, from counsel for Rhodes, who also offered his prediction that McMillan would be named as a third-party defendant. Network Adjusters prepared an initial "Major Loss Report" for its files that same day indicating that, based on the information then in hand, coverage for such a claim would apparently lie under Specialty's policy.

On October 2, 2002, Network Adjusters reported the accident to OneBeacon, McMillan's auto insurer, by telephone. McMillan's policy with OneBeacon provided indemnification for "all sums an insured legally must pay as damages because of bodily injury or property damage . . . caused by an accident and resulting from the ownership, maintenance or use of a covered auto" and the duty to defend against a suit seeking such damages (internal

---

[2]The complaint also named Penske Truck Leasing Corp., which had leased the tractor trailer to BMCA.

-4-

quotation marks omitted).[3]  The pickup truck was a "covered auto" under the policy.

As predicted, Zalewski and Driver Logistics served McMillan with a third-party complaint on September 23, 2003.  They alleged that McMillan had failed in his "duty to provide markers, warning signs, and traffic control devices on the worksite adjacent to Route 109," making him a joint tortfeasor responsible for contribution to the third-party plaintiffs in the event they were found liable for the Rhodeses' injuries.  The third-party complaint did not allege that McMillan's use of the pickup truck had contributed to the accident.

By November 2003, Specialty hired counsel to defend McMillan against the third-party claim.  Several months later, this attorney wrote to OneBeacon, noting that allegations had surfaced during discovery in the lawsuit that his client had "contributed to cause the accident by fail[ing] to pull his pickup truck completely off the side of Route 109."  Counsel for McMillan therefore asked OneBeacon to participate in defending the third-party action under the auto policy.  Ten days later, on June 25, 2004, Network Adjusters wrote to McMillan, asserting that, despite Specialty's participation in the defense to date, its policy did not cover the liability at issue.  The letter explained that, because McMillan's

---

[3]Unlike Specialty's commercial liability policy, the auto policy does not separately define "use."

pickup "was parked along Route 109 and was partially obstructing traffic . . . a causal connection is reasonably apparent between the use to which the vehicle was being put and the alleged injury," placing it within the ambit of OneBeacon's auto policy.

Network Adjusters sent a similar letter to OneBeacon, asking it to assume the obligation to defend McMillan. In response, OneBeacon agreed to participate in, and to pay one half of the further costs of, McMillan's defense, but denied any responsibility to defend or indemnify him. OneBeacon argued that, because the third-party complaint alleged only a failure to warn on McMillan's part, "providing a defense or indemnity would be tantamount to converting . . . OneBeacon's policy into a general liability policy."

At this point, the trial of the Massachusetts state court action was scheduled to commence on September 7, 2004. Before then, however, McMillan reached a settlement with the Rhodeses, which had the effect of extinguishing the third-party contribution claims. See Mass. Gen. Laws ch. 231B, § 4(b) (2000). The settlement called for the Rhodeses to receive $550,000, with Specialty and OneBeacon each paying half of that amount. Each insurer, however, reserved its right to claim that the other was solely responsible for defending and indemnifying McMillan and, therefore, for the entire cost of the settlement. The Rhodeses' claims against the remaining defendants proceeded to trial,

-6-

resulting in verdicts against the remaining defendants in the sum of \$9.4 million--exclusive of interest and costs, which brought the figure to nearly \$12 million.

Specialty then sued OneBeacon in federal district court, seeking to recover the expense of defending and indemnifying McMillan on a theory of equitable subrogation.[4]   OneBeacon counterclaimed against Specialty for OneBeacon's portion of the settlement payment on the same theory.  OneBeacon eventually moved for summary judgment against Specialty, arguing that (1) Specialty was estopped to deny coverage for the liability under McMillan's commercial policy due to Specialty's delay in doing so and (2) alternatively, the liability was not covered by OneBeacon's auto policy.  Specialty opposed the motion and cross-moved for summary judgment on the grounds that (1) the liability fell within the scope of coverage of the auto policy, not the commercial policy and (2) OneBeacon could not assert estoppel because, <u>inter alia</u>, McMillan could not claim to have detrimentally relied on Specialty's delay in denying coverage.

In a margin order, the district court granted OneBeacon's motion for summary judgment and denied Specialty's cross-motion. The district court ruled that it was Specialty's policy that

---

[4]In relevant part, equitable subrogation entitles an insurer who indemnifies its insured against a loss to recover that expense against the party primarily responsible for the loss.  <u>See</u>, <u>e.g.</u>, <u>Frost</u> v. <u>Porter Leasing Corp.</u>, 386 Mass. 425, 426-28, 436 N.E.2d 387, 388-90 (1982).

provided McMillan with indemnification against the third-party
claim.  The court also determined that

> For over two years, Specialty National controlled the
> defense of the claims . . . without asserting that those
> claims were excluded from coverage under the Specialty
> National policy at issue.  This was an unreasonable delay
> which precludes the present claim of Specialty National
> for equitable subrogation.

The district court declared that Specialty was "primarily obligated
to provide coverage" to McMillan for the liability and that
OneBeacon was entitled to equitable subrogation from Specialty for
OneBeacon's share of the settlement payment.  Specialty then
assented to the entry of final judgment for OneBeacon in accordance
with the court's order.[5]  This appeal followed.

## II.

Specialty challenges the district court's rulings on
summary judgment, arguing that McMillan's liability was covered by
the auto policy and that it was not estopped to seek equitable
subrogation against OneBeacon.  We review the district court's
entry of summary judgment de novo.  See, e.g., Brooks v. AIG SunAm.
Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007).  "The
presence of cross-motions for summary judgment neither dilutes nor

---

[5]Specialty did so despite the fact that neither the parties'
summary judgment motions nor the district court's order addressed
that portion of Specialty's claim seeking its expenses in defending
McMillan. Specialty thus abandoned that portion of its claim, see
Jarrett v. Town of Yarmouth, 331 F.3d 140, 145 (1st Cir. 2003), and
we do not consider it.

distorts this standard of review." <u>Mandel</u> v. <u>Boston Phoenix, Inc.</u>, 456 F.3d 198, 205 (1st Cir. 2006).

**A.**

The interpretation of an insurance policy poses a question of law. <u>See</u>, <u>e.g.</u>, <u>Fuller</u> v. <u>First Fin. Ins. Co.</u>, 448 Mass. 1, 5, 858 N.E.2d 288, 291 (2006); <u>accord</u> <u>Merchants Ins. Co. of N.H.</u> v. <u>United States Fid. & Guar. Co.</u>, 143 F.3d 5, 8 (1st Cir. 1998). In the absence of an ambiguity--and here, both parties say there is none--a court must construe the words of the policy in their usual and ordinary sense. <u>See</u>, <u>e.g.</u>, <u>Fuller</u>, 448 Mass. at 5, 858 N.E.2d at 291-92; <u>accord</u> <u>Fireman's Fund Ins. Co.</u> v. <u>Special Olympics Int'l, Inc.</u>, 346 F.3d 259, 261 (1st Cir. 2003).

OneBeacon's auto policy covers liability "<u>resulting from</u> the . . . use of a covered auto," while Specialty's excludes liability "<u>arising out of</u> the . . . use . . . of any . . . auto" (emphases added). Despite this slight variation in language, the parties agree that their policies are essentially mirror images of each other in this regard--if McMillan's liability is covered under OneBeacon's policy, it is excluded from Specialty's policy, and vice versa.[6] <u>See</u> <u>Ruggerio Ambulance Serv., Inc.</u> v. <u>Nat'l Grange Ins. Co.</u>, 430 Mass. 794, 797, 724 N.E.2d 295, 299 (2000) (relying

---

[6]In fact, Massachusetts law requires any "motor vehicle policy" to provide indemnification against loss "<u>arising out of</u> the ownership, operation, maintenance, control, or use" of the covered vehicle. Mass. Gen. Laws ch. 90, § 34A (2000) (made mandatory by Mass. Gen. Laws ch. 175, § 113A(4) (2000)) (emphasis added).

on authorities interpreting "arising out of" to construe "resulting from" language in auto policy).

Massachusetts courts are regularly called upon to decide whether a particular injury "arises out of" the use of an auto for purposes of insurance coverage, and "[t]he distinctions drawn in this area are not always obvious."[7] Metro. Prop. & Cas. Ins. Co. v. Santos, 55 Mass. App. Ct. 789, 795 n.9, 774 N.E.2d 1128, 1133 n.9 (2002) (discussing divergent outcomes). Indeed, "[t]here is no bright line test indicating when an injury may be said to arise out of the use of an automobile." White v. Am. Cas. Ins. Co., 53 Mass. App. Ct. 66, 70, 756 N.E.2d 1208, 1212 (2001). Nevertheless, the case law in this area does provide some guidance. "The expression 'arising out of' indicates a wider range of causation than the concept of proximate causation in tort law. However, the expression does not refer to all circumstances in which the injury would not have occurred 'but for' the involvement of a motor vehicle." Rischitelli v. Safety Ins. Co., 423 Mass. 703, 704, 671 N.E.2d 1243, 1245 (1996) (citations omitted).

It follows, as OneBeacon points out, that the mere involvement of a motor vehicle in a particular misfortune does not

---

[7]For example, Massachusetts courts have ruled that injuries to a pedestrian struck by a bullet shot from a parked car with the engine running did not arise out of the use of the vehicle, Sabatinelli v. Travelers Ins. Co., 369 Mass. 674, 677, 341 N.E.2d 880, 882 (1976), while injuries to a pedestrian struck by a bottle thrown from a passing car did, Assetta v. Safety Ins. Co., 43 Mass. App. Ct. 317, 319, 682 N.E.2d 931, 933 (1997).

mean that the resulting injuries are covered by auto insurance. See Ruggerio Ambulance Serv., 430 Mass. at 797, 724 N.E.2d at 298 (rejecting "proposition that any use or operation of a motor vehicle results in coverage under a motor vehicle policy"). So Massachusetts courts have found the connection between an accident that delayed an ambulance en route to a dying man and his death "too attenuated" to bring the liability within the scope of the ambulance company's auto insurance, id. at 798, 724 N.E.2d at 299, and that, when an insured left his vehicle to attack another driver following a collision, "[t]he battery on the plaintiff was sufficiently independent of the motor vehicle accident that the losses that the plaintiff sustained arose from the intentional wrongdoing of the other driver and not from the use of an automobile," Rischitelli, 423 Mass. at 707, 671 N.E.2d at 1246. See also Tae v. Tae, 57 Mass. App. Ct. 297, 300-01, 783 N.E.2d 827, 830 (2003) (finding injuries sustained in explosion of kitchen stove caused when insured drained gas from vehicle into bucket, carried it into dwelling, and used gas to immolate himself "insufficiently dependent on the . . . use of the automobile to be covered by the automobile insurance policy").

Here, though, the connection between the use of McMillan's pickup truck and the Rhodeses' injuries was closer than the "attenuated" or "independent" relationships found inadequate in these other cases. As the police report indicates, it was the

-11-

positioning of part of the pickup in the roadway that required the
police officer to direct traffic through the area one lane at a
time.  Had the officer, in doing so, not directed Rhodes to stop
her car to allow vehicles traveling in the other direction to pass,
she would not have been rear-ended by the tractor-trailer.  Even if
this sequence does not necessarily establish proximate cause as a
matter of law--and it at least comes close, see Wilborg v. Denzell,
359 Mass. 279, 282, 268 N.E.2d 855, 856 (1971) (rejecting
challenge, on proximate cause grounds, to verdict for plaintiff
injured in collision with motorist who crossed into her lane while
swerving around defendant's stalled car)--"'a causal connection is
reasonably apparent between the use to which the vehicle [was]
being put and the resulting injury.'"  Ruggerio Ambulance Serv.,
430 Mass. at 798, 724 N.E.2d at 299 (quoting 8 Lee R. Russ & Thomas
Sagalia, Couch on Insurance § 119:30 (3d ed. 1995)); see also
Assetta, 43 Mass. App. Ct. at 319, 682 N.E.2d at 932 (ruling that
injuries caused by bottle thrown from moving vehicle arose out of
its use because "it is reasonable to assume that its movement
affected both the trajectory of the bottle and the force with which
it struck" plaintiff).  McMillan's liability for the Rhodeses'
injuries is therefore covered by his auto policy with OneBeacon and
excluded from his commercial liability policy with Specialty.  See
Allstate Ins. Co. v. Safer, 317 F. Supp. 2d 1345, 1350-54 (M.D.
Fla. 2004) (ruling that liability for negligently parking truck to

obscure view of intersection, resulting in collision between two other vehicles, was injury "arising out of the use of an auto" excluded from commercial liability policy).

In disputing this conclusion, OneBeacon notes that the third-party complaint sought contribution for the Rhodeses' damages solely on a theory that McMillan had failed to place the requisite signs warning of the work adjacent to the roadway, as opposed to any negligence in his positioning of the vehicle.  The scope of liability coverage, however, depends on "the 'source from which the plaintiff's personal injury originates rather than the specific theories of liability alleged in the complaint of the underlying civil action.'"  Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 7 (1st Cir. 2000) (quoting Bagley v. Monticello Ins. Co., 430 Mass. 454, 458, 720 N.E.2d 813, 817 (1999)) (bracketing omitted).[8]  As just discussed, the placement of part of McMillan's truck in the roadway was a "source" of the Rhodeses' injuries in the sense that it bore the necessary causal relationship to them.[9]  That Zalewski and his employer sought to

---

[8]This rule exists to disallow a plaintiff injured by the insured "to circumvent a bar to coverage by carefully drafting a complaint to avoid an exclusion."  Bagley, 430 Mass. at 459, 720 N.E.2d at 817 (footnote omitted).

[9]As OneBeacon further notes, the third-party complaint alleged that "[i]t is the Town of Medway's policy whenever there is any tree work being done on a public way to have a police officer there to direct traffic around the work area . . . ."  OneBeacon therefore suggests that the officer would have stopped Rhodes's car, and the accident would have occurred, regardless of whether McMillan's

hold McMillan responsible for the accident based on different, allegedly negligent acts does not undermine that conclusion. See Brazas Sporting Arms, 220 F.3d at 7-9 (ruling that claim of negligently flooding market with firearms fell within products liability exclusion to commercial liability policy because "firearms were the immediate source of the plaintiffs' injuries").

OneBeacon also maintains that McMillan's liability is not covered by its auto policy because the pickup truck was not in "use" at the time of the collision. To the contrary, OneBeacon argues, McMillan was grinding a stump at that point, which would have required him to get out of the pickup in order to operate the grinder. This argument, however, mistakenly focuses on what McMillan was doing at the precise moment of the accident, when the proper inquiry under the policies is whether McMillan's liability for the accident arises out of the use of the pickup. Before engaging the stump he was working on at the time of the crash, McMillan had driven his truck past the stump and backed the grinder up to it. This was unquestionably a "use" of the pickup truck and, as we have already concluded, it was this use that had a causal connection to the accident in the sense that the positioning of the truck vis-à-vis the roadway required the officer to stop Rhodes.

pickup was blocking part of the road. We do not think this point follows logically from the allegation at hand; moreover, it is directly contradicted by the police report of the crash.

-14-

Whether McMillan was also making "use" of the truck
within the meaning of the policies by operating the stump grinder
at the instant of the crash, then, is irrelevant--though we suspect
that he was.  See White, 53 Mass. App. Ct. at 68, 756 N.E.2d at
1211 ("'[t]he term "use" must be understood in its most
comprehensive sense; and the term is not confined to motion on a
highway, but extends to any activity in utilizing the insured
vehicle in the manner intended or contemplated by the insured'")
(quoting 8 Russ & Segalia, supra, § 119:37).  We therefore conclude
that the district court erred in ruling that Specialty, not
OneBeacon, had the duty to indemnify McMillan against the third-
party claim seeking contribution for the Rhodeses' injuries.  That
liability arose out of McMillan's use of the pickup truck, bringing
it within the scope of OneBeacon's auto policy and excluding it
from Specialty's general commercial liability policy.

**B.**

In granting summary judgment for OneBeacon, the district
court also ruled that Specialty was estopped to pursue equitable
subrogation because "[f]or over two years, [it] controlled the
defense of the claims . . . without asserting that those claims
were excluded from coverage" under the general commercial liability
policy.  Specialty challenges this ruling on the ground that its
delay in disclaiming coverage did not cause McMillan--or, in turn,
OneBeacon--any prejudice, which Specialty characterizes as an

-15-

essential element of an estoppel claim.  In response, OneBeacon argues that Massachusetts law presumes prejudice in a case such as this, i.e., where an insurer was deprived of "an opportunity to protect its interests," but that, in any event, McMillan and OneBeacon were in fact prejudiced by Specialty's delay.

Massachusetts follows the rule that a liability insurer, "having led the assured to rely exclusively on its protection during the period when he might have protected himself . . . cannot, in fairness, thereafter withdraw that protection." Salonen v. Paanenen, 320 Mass. 568, 572, 71 N.E.2d 227, 230 (1947). This rule "rests on estoppel or waiver," id., so, as OneBeacon acknowledges, "[t]he familiar criteria for an estoppel" govern its application. Safety Ins. Co. v. Day, 65 Mass. App. Ct. 15, 23, 836 N.E.2d 339, 346 (2005). Thus, to become estopped from denying coverage under a liability insurance policy, an insurer must say or do something intended to induce conduct on the part of its insured; the insured must act or refrain from acting in reasonable reliance on the insurer's representation; and the insured must suffer some detriment as a result. Id.

Where, as here, the relevant facts are undisputed, the existence of an estoppel is a question of law. Id. at 24, 836 N.E.2d at 347.  Although McMillan notified Specialty of the accident in March 2002, Specialty did not learn that the Rhodeses had filed suit until that September, and, even then, McMillan had

-16-

not yet been named as a party to the suit. It was not until he was served with the third-party complaint in September 2003, leading Specialty to secure counsel to defend him, that it did anything that could reasonably have led McMillan to believe that Specialty would defend or indemnify him under the terms of the general commercial liability policy. Until then, there was no "suit" to defend and thus no way for McMillan to become "legally obligated" to pay damages to indemnify.

In any event, there is no evidence that McMillan did, or refrained from doing, anything in response to Specialty's actions, either before or after it hired him an attorney. Nor is there any evidence that whatever McMillan did, or failed to do, worked to his detriment. OneBeacon suggests that McMillan could have retained his own counsel had he known that Specialty would disclaim coverage, but there is nothing to suggest that, had he done so, the claim would have been resolved more favorably to him. As it stands, McMillan was able to pay just $550,000 to settle the same claim that resulted in a nearly $12 million judgment against the remaining defendants.

For this reason, Safety Insurance, on which the district court relied, does not support a finding of estoppel here. There, after the insurer began defending its insured against a lawsuit, the insurer "ignored opportunities to settle the case" for $250,000 or less despite mounting evidence that a defense would be

-17-

difficult, and without informing the insured of these opportunities. 65 Mass. App. Ct. at 24, 836 N.E.2d at 347. The insurer then sought to contest coverage while simultaneously continuing to defend the insured against the suit; during this period, the insurer mistakenly disclosed its attorney's negative assessment of his case to opposing counsel such that the opportunity to settle for $250,000 "was irretrievably lost." Id. The insured ultimately settled the case for $700,000, which the court concluded was "$450,000 over and above what the . . . case could have settled for if properly managed." 65 Mass. App. Ct. at 25, 836 N.E.2d at 347. Here, in contrast, there is no suggestion, let alone any evidence, that Specialty mishandled McMillan's defense, or that he ever could have settled for less than he did.[10]

OneBeacon also argues that it suffered from Specialty's delay in disclaiming coverage by having to pay $275,000 toward the settlement. While prejudice to OneBeacon, as McMillan's subrogee, could suffice to make out an estoppel, see id. (reasoning that detriment was not eliminated by satisfaction of liability by another insurer because of harm to that insurer's subrogation

_____

[10]OneBeacon intimates that McMillan might not have been sued at all had he appeared with counsel at his deposition in the underlying lawsuit. But OneBeacon does not explain how the simple presence of counsel would have dissuaded the third-party plaintiffs from suing McMillan, so this amounts to mere speculation. Furthermore, because the deposition was taken before the third-party complaint was filed, Specialty had not undertaken to defend him at that point, so McMillan could not have chosen to appear without counsel in reliance on anything Specialty had done.

-18-

right), OneBeacon has not shown any. It postulates that it might have hired counsel for McMillan to seek a declaratory judgment that he was not liable to the Rhodeses, or even to intervene in their lawsuit, rather than waiting to get brought in on a third-party complaint. But OneBeacon does not explain how these tactics would have improved McMillan's settlement position, and the point is far from obvious. Speculation as to the insured's detrimental reliance cannot sustain an estoppel claim. See Creveling v. Gov't Employees Ins. Co., 828 A.2d 229, 247 (Md. 2003). Moreover, OneBeacon does not dispute that it learned of the accident from Specialty in October 2002, nearly a year before McMillan was served with the third-party complaint, so OneBeacon had ample time to launch the pre-emptive strike it describes, to whatever avail.

Finally, OneBeacon urges us to presume detrimental reliance, directing us to a string of cases it cites for the proposition that, when an insured breaches a voluntary payment clause in a policy of liability insurance,[11] the carrier is relieved of its duty to indemnify. See, e.g., Augat, 410 Mass. at 122-24, 571 N.E.2d at 360-61. We have our doubts as to whether those cases stand for that proposition. See Employers' Liab. Assurance Corp. v. Hoechst Celanese Corp., 43 Mass. App. Ct. 465, 481 684 N.E.2d

---

[11]Such a clause generally forbids the insured from voluntarily making payment toward a claim covered under the policy. See Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 119-20, 571 N.E.2d 357, 359 (1991).

Case 1:04-cv-12306-RCL   Document 41   Filed 05/24/2007   Page 20 of 21

600, 610-11 (1997) (accusing insurers of "misreading Augat itself when they suggest that, in the face of a violation by an insured of the express prohibition of voluntary payments . . ., the insurer is forthwith discharged of responsibility without having to demonstrate prejudice") (harmonizing cases). But, whether or not an insurer must show prejudice to withdraw coverage based on the violation of a voluntary payment clause, Massachusetts has steadfastly required insureds to show detrimental reliance when they claim their insurer is estopped to deny its duty to defend or indemnify. See Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 468, 645 N.E.2d 1165, 1169 (1995); Salonen, 320 Mass. at 573, 71 N.E.2d at 231; Phillips v. Stone, 297 Mass. 341, 343-44, 8 N.E.2d 890, 891-92 (1937); Lunt v. Aetna Life Ins. Co. of Hartford, Conn., 261 Mass. 469, 473, 159 N.E.2d 461, 473 (1928); Specialty Ins., 65 Mass. App. Ct. at 23, 836 N.E.2d at 346.

    We are not free to reexamine Massachusetts law on this point. See, e.g., Baena v. KPMG LLP, 453 F.3d 1, 9-10 (1st Cir. 2006). We note, however, that the prejudice requirement in this context serves an important role:

> The only reason that an insurer must notify an insured of its reservation of the right to disclaim liability is to avoid the unfairness that exists when an insurer misleads the insured into relying on the insurer's protection. Where there is no unfairness, because there is no misleading or reliance, there is no reason for estoppel.

DiMarzo v. Am. Mut. Ins. Co., 389 Mass. 85, 112, 449 N.E.2d 1189, 1205-06 (1983) (O'Connor, J., concurring). The failure to show

-20-

that Specialty's delay in disclaiming coverage harm worked to the detriment of McMillan or OneBeacon, then, was fatal to its estoppel claim.[12]  The district court erred when it found Specialty estopped to seek subrogation from OneBeacon.

## III.

We conclude that McMillan's liability for the Rhodeses' injuries is covered by his auto policy with OneBeacon, not his general commercial liability policy with Specialty, and that Specialty is not estopped to seek equitable subrogation from OneBeacon.  Accordingly, the district court should have granted Specialty's, and denied OneBeacon's, motion for summary judgment. We **reverse** the judgment below and **remand** for the entry of judgment in favor of Specialty.

**So ordered.**

---

[12]In the district court, and to a lesser extent here, OneBeacon has relied on Network Adjusters's intracompany communications to the effect that Specialty's policy covered the third-party claim.  In line with the authorities we have discussed, however, "an insurer's admission that coverage exists does not estop the insurer from denying coverage if the insured did not reasonably rely to its detriment on the admission."  1 Allan D. Windt, Insurance Claims and Disputes § 6:33 (4th ed. 2001) (footnote omitted).  That is the case here.

-21-